\*\*\*\* CASE NUMBER: 502022CA000149XXXXMB Div: AD \*\*\*\*

Filing # 141564035 E-Filed 01/07/2022 12:02:16 PM

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN AND FOR
PALM BEACH COUNTY, FLORIDA

DAVID E. FRIEDMAN and MELINDA FRIEDMAN, as Permanent Co-Guardians of Aaron G. Friedman,

CASE NO.: 50.2022.CA.149.MB
JUDGE:

Plaintiffs,

vs.

MASTERPHARM, LLC d/b/a MASTERPHARM COMPOUNDING PHARMACY, ALAN J. BAUMAN, M.D. and BAUMAN MEDICAL GROUP, P.A.,

Defendants.
_____/

## PLAINTIFFS' COMPLAINT

Plaintiffs, DAVID E. FRIEDMAN and MELINDA FRIEDMAN, as Permanent Co-Guardians of Aaron G. Friedman, through counsel, sue Defendants, MASTERPHARM, LLC d/b/a MASTERPHARM COMPOUNDING PHARMACY, ALAN J. BAUMAN, M.D. and BAUMAN MEDICAL GROUP, P.A., and allege:

### JURISDICTIONAL STATEMENT AND IDENTIFICATION OF THE PARTIES

1) This action and the events giving rise to this cause of action as set forth herein occurred within the County of Palm Beach, State of Florida, and this court has jurisdiction over the parties and the subject matter of this litigation with damages in excess of Thirty Thousand Dollars ($30,000.00) exclusive of attorneys' fees, interest and costs.

2) On January 7, 2019, Plaintiffs, DAVID E. FRIEDMAN and MELINDA FRIEDMAN, were appointed as Permanent Co-Guardians of Aaron G. Friedman, pursuant to the Letter and Acceptance of Permanent Guardian of an Adult Protected Person which is attached hereto and made a part of this pleading as Plaintiffs' Exhibit "A".

**EXHIBIT A-1**

3) At all times relevant to this action, Plaintiffs, DAVID E. FRIEDMAN and MELINDA FRIEDMAN, along with their ward, Aaron Friedman, ("Plaintiffs' ward") were Florida residents residing in Palm Beach County, Florida.

4) At all times material to this complaint, Defendant, MASTERPHARM, LLC d/b/a MASTERPHARM COMPOUNDING PHARMACY, ("MASTERPHARM"), was a mail-based compounding pharmacy with headquarters at 115-02 Liberty Avenue, Richmond Hill, New York 11419.

5) Defendant, MASTERPHARM, upon information and belief, was and is a business entity which, at all times material here to, was doing business in the State of Florida. MASTERPHARM shipped the subject product to Aaron G. Friedman in Palm Beach County, Florida, and the damages that arose from MASTERPHARM's negligence occurred in Palm Beach County, Florida. As such, jurisdiction and venue is proper in Palm Beach County, Florida.

6) At all material times, Defendant, ALAN J. BAUMAN, M.D., ("BAUMAN") was a medical doctor licensed in the state of Florida and in fact practicing medicine in Palm Beach County, Florida.

7) At all material times, Defendant, BAUMAN MEDICAL GROUP, P.A., ("BMG") was a Florida Profit Corporation organized and existing under the laws of the state of Florida, authorized to do and doing business in Palm Beach County, Florida, with its principal address in Palm Beach County, Florida.

8) At all material times, BAUMAN was an agents and/or apparent agent, servant or employee of BMG, and was acting within the course and scope of his

2

employment or agency. As such, and BMG is vicariously liable for the actions of BAUMAN.

9) Defendants, BAUMAN and BMG operated a physical retail store in the lobby of the building which houses BAUMAN's medical practice in Boca Raton, Florida. The said store also operates a website found at http://shop.baumanmedical.com. Through this store, BAUMAN and BMG marketed, dispensed, distributed, shipped, promoted, packaged, sold and/or placed into the stream of commerce various prescription and non-prescription drugs and hair care products, including the FinPlus which caused the injury which is the subject of this lawsuit.

10) At all material times, the pharmaceutical drug Finasteride Plus ("FinPlus"), which caused injuries and damages to the Plaintiffs' ward, was compounded, prepared, dispensed, distributed, packaged, placed into the stream of commerce, and delivered by the MASTERPHARM, BAUMAN and BMG.

11) At all material times, BAUMAN and BMG, marketed and sold the subject FinPlus directly to Plaintiffs' ward, and were thus in the chain of distribution of the subject defective product.

## Facts Applicable to All Counts

12) On or about October 20, 2016, Plaintiffs' ward was seen in consultation by BAUMAN at his Boca Raton office for hair loss treatment. At that time, BAUMAN recommended that Plaintiffs' ward use several products to aid in regrowth of his hair, including a drug known as Finasteride. Finasteride is the active ingredient in Propecia, an FDA approved drug for hair regrowth and male pattern baldness which has been safely

3

used since 1997 in the United States and has been available in generic form, at a much lower price than the name brand product, since 2006. Rather than prescribing Propecia or its generic version, BAUMAN recommended that Plaintiffs' ward use FinPlus that was prepared by MASTERPHARM and sold directly by BMG. At that time BAUMAN referred to MASTERPHARM as, "his compounding pharmacy," "his lab," and further stated that he was personally involved in the formulation of FinPlus, and that it was superior in results to Propecia but had less side effects. BAUMAN further stated that FinPlus was only available to his patients through his store. Based upon BAUMAN'S recommendation the Plaintiffs' ward agreed to purchase FinPlus from BAUMAN and BMG's store which charged a much higher price for it than the typical purchase price of Propecia's generic equivalent.

13) Plaintiffs' ward purchased FinPlus directly from BAUMAN and BMG's store in 3 month supplies, beginning on October 20, 2016 and continuing through March 16, 2020. Throughout that same period, Plaintiffs' ward also purchased dozens of other products from BAUMAN and BMG's retail store, including shampoo, conditioner, oral supplements and topical hair loss solution. All told, Plaintiffs' ward purchased over $6,500 worth of hair products (including the subject FinPlus) from BAUMAN and BMG's store. In contrast, Plaintiff was charged $100.00 for his consultation with BAUMAN. Given the foregoing, the distribution of FinPlus, as well as the other products sold by BAUMAN and BMG to the Plaintiffs' ward, was and is a distinct part of BAUMAN and BMG's business, and the sales and distribution aspect of BAUMAN'S interaction with Plaintiffs' ward clearly predominated over the services aspect of his consultation.

14) Unbeknownst to Plaintiff, at some time prior to March 2020, MASTERPHARM shipped Plaintiffs' ward a contaminated batch of FinPlus. The contaminated FinPlus contained undeclared minoxidil, an antihypertensive drug, at levels much greater than those found in FDA approved products. The contaminated FinPlus was prepared by MASTERPHARM and sold directly to the Plaintiffs' ward by BAUMAN and BMG. MASTERPHARM'S agents and/or employees improperly mixed and/or mislabeled FinPlus in that, instead of containing all the expected concentrations of the drugs indicated on its labeling, the contaminated medication contained an unreasonably dangerous concentration of minoxidil.

15) In March 2020, Plaintiffs' ward consumed the contaminated FinPlus and suffered serious injuries from same, including but not limited to, severe nausea, vomiting, no urine output, and ultimately acute renal failure for which he was hospitalized for several days.

## COUNT I
## STRICT LIABILITY CLAIM
## AGAINST MASTERPHARM, BAUMAN and BMG

Plaintiffs re-allege and re-incorporate the allegations contained in paragraphs 1 through 15 above as though fully set forth herein, and further state:

16) Defendants, MASTERPHARM, BAUMAN and BMG, were jointly engaged in the business of designing, manufacturing, compounding, mixing, making, creating, packaging, marketing, advertising, distributing and selling FinPlus (including the contaminated FinPlus purchased and used by Plaintiffs' ward), which Defendants knew would be purchased and used by the general public.

17) Defendants, MASTERPHARM, BAUMAN and BMG designed, manufactured, compounded, mixed, made, created, packaged, tested, inspected, distributed, and/or sold the subject FinPlus, which was purchased and consumed by Plaintiffs' ward.

18) In or about, and before March 22, 2020, Plaintiffs' ward consumed the subject FinPlus for the purposes for which it was intended and in a manner reasonably foreseeable to Defendants, MASTERPHARM, BAUMAN and BMG.

19) Defendants, MASTERPHARM, BAUMAN and BMG, designed, manufactured, compounded, mixed, made, created, packaged, inspected, tested, distributed, and/or sold the subject FinPlus in a manner which rendered the said drug defective and unsafe for its intended use, due to the following, without limitation:

(a) The subject FinPlus was not reasonably fit for the uses intended or reasonably foreseeable by Defendants.

(b) The subject FinPlus was in a condition unreasonably dangerous to Plaintiff in that said drug failed to perform as safely as an ordinary consumer would expect when used as intended.

(c) The subject FinPlus was in a condition unreasonably dangerous to Plaintiff in that said drug contained a dangerous level of minoxidil.

(d) The subject FinPlus was in a condition unreasonably dangerous to Plaintiffs' ward in that it contained a toxic substance at levels that could harm, injure or kill people who utilized the drug.

(e) The subject FinPlus was in a condition unreasonably dangerous to Plaintiffs' ward in that said drug endangered consumers when used, creating an unreasonable risk of harm, injury or death.

(f) The subject FinPlus and its labeling failed to disclose the presence of minoxidil and the dangerously high levels of same.

(g) The subject FinPlus was contaminated with dangerously high levels of minoxidil.

(h) The subject FinPlus lacked reasonable and adequate warnings to users as to the dangerous propensities of its ingredients.

(i) The subject FinPlus lacked warnings that were reasonably sufficient in size, placement, prominence, and in the manner in which said warnings were conveyed to users of the drug as to its dangerous propensities.

(j) The subject FinPlus was designed, manufactured, made, distributed and sold using unsafe ingredients and substances.

(k) The subject FinPlus was designed, manufactured, made, distributed and sold using a toxic ingredient, at toxic levels, that presented an unreasonable risk of harm, injury or death.

(l) The subject FinPlus was designed, manufactured, made, marketed, distributed and sold in a manner that when used in the normal course and as directed, could result in harm, injury or death.

(m) The said FinPlus was not subjected to appropriate safety testing prior to being distributed, marketed, sold, or otherwise placed into the stream of commerce.

20) The subject FinPlus was defective when it left the possession of Defendants, and was expected to, and did reach, the user/consumer without substantial change in its condition.

21) Defendants, MASTERPHARM, BAUMAN and BMG's design, manufacturing, compounding, making, creation, testing, inspection, distribution, marketing and sale of the subject FinPlus caused the defective and unsafe condition as afore-described and alleged, which was the proximate cause of the incident afore-described and alleged, and, thus, Defendants, MASTERPHARM, BAUMAN and BMG are strictly liable in tort to Plaintiffs.

22) As a direct and proximate result of the above-described conduct of Defendants, MASTERPHARM, BAUMAN and BMG, and the above-described condition of the subject FinPlus, the above-described incident occurred and Plaintiffs' ward suffered permanent and severe injuries.

23) As a direct and proximate result of the defective product and the actions of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs' ward was seriously and severely injured in and about the body, head, neck, back and limbs, and suffered bodily injury, resulting in pain and suffering, disability, disfigurement, physical impairment, inconvenience, mental anguish, loss of enjoyment of life, psychological and/or emotional distress, or, in the alternative, the foregoing injuries thereby caused or contributed to

cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiffs' ward has in the past suffered and will in the future suffer great pain and anguish of body and mind, and loss of capacity for the enjoyment of life, all of which conditions are permanent and continuing in nature.

24) As a further direct and/or proximate result of the defective product and the aforementioned carelessness, actions and conduct of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs' ward has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

25) As a further direct and/or proximate result of the defective product and the aforementioned carelessness, action and conduct of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs' ward has in the past sustained, and will in the future sustain loss of earnings and earning capacity.

WHEREFORE, Plaintiffs demand judgment against Defendants, MASTERPHARM, BAUMAN and BMG, in an amount in excess of THIRTY THOUSAND DOLLARS ($30,000.00), together with interest and costs, which are prayed for in addition thereto.

## COUNT II
## NEGLIGENCE CLAIM AGAINST
## DEFENDANTS, MASTERPHARM, BAUMAN and BMG

Plaintiffs re-allege and re-incorporate the allegations contained in paragraphs 1 through 15 above as though fully set forth herein, and further state:

9

26) Defendants, MASTERPHARM, BAUMAN and BMG were jointly engaged in the business of designing, manufacturing, compounding, mixing, developing, packaging, marketing, advertising, distributing and selling FinPlus products (including the FinPlus purchased and used by Plaintiffs' ward), which Defendants, MASTERPHARM, BAUMAN and BMG, knew would be purchased and used by the general public.

27) Defendants, MASTERPHARM, BAUMAN and BMG, designed, manufactured, mixed, created, developed, distributed, and/or sold the FinPlus purchased and used by Plaintiffs' ward.

28) Defendants, MASTERPHARM, BAUMAN and BMG, knew, or, in the exercise of reasonable care, should have known, that said FinPlus was not properly designed, manufactured, compounded, mixed, made, tested, inspected, and sold, and knew, or, in the exercise of reasonable care, should have known, that said FinPlus created an unreasonable risk of harm to persons, like the Plaintiffs' ward.

29) Defendants, MASTERPHARM, BAUMAN and BMG, owed a duty to Plaintiffs' ward, and the consuming public to design, make, manufacture, and/or test its FinPlus, including the subject FinPlus batch, in such a manner that it would be safe and not pose an unreasonable risk of harm to the life and safety of Plaintiffs' ward, and the consuming public when utilized in normal and foreseeable situations.

30) Defendants, MASTERPHARM, BAUMAN and BMG, owed a duty to Plaintiffs' ward, and the consuming public to distribute and sell FinPlus, including the subject FinPlus, in such a manner that it would be safe and not pose an unreasonable

risk of harm to the life and safety of Plaintiffs' ward, and the consuming public when utilized in normal and foreseeable situations.

31) Defendants, MASTERPHARM, BAUMAN and BMG, owed a duty to the Plaintiffs' ward, and the consuming public to test the FinPlus it distributes and sells, to confirm they would be safe and not pose an unreasonable risk of harm to the life and safety of the Plaintiffs' ward, and the consuming public when utilized in normal and foreseeable situations.

32) Defendants, MASTERPHARM, BAUMAN and BMG, owed a duty to convey to consumers and users a fair and adequate warning of the dangerous characteristics of the subject FinPlus so that the users, in the exercise of reasonable care, would have fair and adequate notice of the possible adverse consequences of using the subject drug.

33) Defendants, MASTERPHARM, BAUMAN and BMG, negligently designed, manufactured, compounded, mixed, made, created, tested, marketed, inspected, distributed, sold the FinPlus in some and/or all of, but not limited to, the following respects:

    a) The subject FinPlus was not reasonably fit for the uses intended or reasonably foreseeable by Defendants.

    b) The subject FinPlus was in a condition unreasonably dangerous to Plaintiff in that said drug failed to perform as safely as an ordinary consumer would expect when used as intended.

    c) The subject FinPlus was in a condition unreasonably dangerous to Plaintiff in that said drug contained a dangerous level of minoxidil.

d) The subject FinPlus was in a condition unreasonably dangerous to Plaintiffs' ward in that it contained a toxic substance at levels that could harm, injure or kill people who utilized the drug.

e) The subject FinPlus was in a condition unreasonably dangerous to Plaintiffs' ward in that said drug endangered consumers when used, creating an unreasonable risk of harm, injury or death.

f) The subject FinPlus and its labeling failed to disclose the presence of minoxidil and the dangerously high levels of same.

g) The subject FinPlus was contaminated with dangerously high levels of minoxidil.

h) The subject FinPlus lacked reasonable and adequate warnings to users as to the dangerous propensities of its ingredients.

i) The subject FinPlus lacked warnings that were reasonably sufficient in size, placement, prominence, and in the manner in which said warnings were conveyed to users of the drug as to its dangerous propensities.

j) The subject FinPlus was designed, manufactured, made, distributed and sold using unsafe ingredients and substances.

k) The subject FinPlus was designed, manufactured, made, distributed and sold using a toxic ingredient, at toxic levels, that presented an unreasonable risk of harm, injury or death.

l) The subject FinPlus was designed, manufactured, made, marketed, distributed and sold in a manner that when used in the normal course and as directed, could result in harm, injury or death.

m) The said FinPlus was not subjected to appropriate safety testing prior to being distributed, marketed, sold, or otherwise placed into the stream of commerce.

34) As a direct and proximate result of the above-described negligence of Defendants, MASTERPHARM, BAUMAN and BMG, and the above-described condition of the subject FinPlus, the subject incident occurred and Plaintiffs' ward suffered permanent and severe injuries.

35) As a direct and proximate result of the negligence of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs' ward was seriously and severely injured in and about the body, head, neck, back and limbs, and suffered bodily injury, resulting in pain and suffering, disability, disfigurement, physical impairment, inconvenience, mental anguish, loss of enjoyment of life, psychological and/or emotional distress, or, in the alternative, the foregoing injuries thereby caused or contributed to cause an aggravation of a previous existing defect or infirmity; and as a direct result thereof, Plaintiffs' ward has in the past suffered and will in the future suffer great pain and anguish of body and mind, and loss of capacity for the enjoyment of life, all of which conditions are permanent and continuing in nature.

36) As a further direct and/or proximate result of the negligence, carelessness, actions and conduct of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs'

ward has in the past undergone and will in the future undergo painful and extensive medical care and treatment, and has in the past incurred, and will in the future incur, medical bills and expenses attendant to the injuries, as aforesaid.

37) As a further direct and/or proximate result of the negligence, carelessness, action and conduct of Defendants, MASTERPHARM, BAUMAN and BMG, Plaintiffs' ward has in the past sustained, and will in the future sustain loss of earnings and earning capacity.

WHEREFORE, Plaintiffs demand judgment against Defendants, MASTERPHARM, BAUMAN and BMG, in an amount in excess of THIRTY THOUSAND DOLLARS ($30,000.00), together with interest and costs, which are prayed for in addition thereto.

## DEMAND FOR JURY TRIAL

Plaintiffs in the above styled cause hereby demand a trial by jury of all of the issues triable by right.

Dated this 7th day of January 2022.

Respectfully Submitted,

**KELLEY | UUSTAL**
Counsel for Plaintiffs
500 North Federal Highway - Suite 200
Fort Lauderdale, Florida 33301
Telephone: (954) 522-6601
Facsimile: (954) 522-6608
trf@kulaw.com

By: /s/ *Todd R. Falzone*
TODD R. FALZONE
Florida Bar No. 0975184

TRF/jmh

```
1  Leigh H. Bernstein
   Rubin & Bernstein PLLC
2  382 S. Convent Ave.
   Tucson, AZ 85701
3  (520) 623-3038
   AZ State Bar No. 016123
4  Pima County No. 65054
5
```

FILED
GARY HARRISON
19 JAN -7 AM 10: 42
BY: R. MURRAY, DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

| In the Matter of the Guardianship of: | NO. GC20180749 |
|---|---|
| AARON GORDON FRIEDMAN<br><br>An Adult | LETTERS AND ACCEPTANCE OF PERMANENT GUARDIAN OF AN ADULT PROTECTED PERSON |

## ISSUANCE OF LETTERS

David Friedman and Melinda Friedman are appointed as Aaron Friedman's permanent co-guardians. Each co-guardian will have the authority to act independently of the other. Additionally, the co-guardians' power shall be subject to the following restrictions: NONE Aaron Gordon Friedman retains his right to vote as well as his driving priviliges.

WITNESS: _____

GARY HARRISON
CLERK OF THE SUPERIOR COURT

JAN - 7 2019

By: /s/ _____
Deputy Clerk

State of Florida
County of Palm Beach     ss.     **ACCEPTANCE**

We hereby accept the duties of co-guardians for Aaron Friedman and swear that we will perform such duties according to law.

_____          _____
David Friedman                    Melinda Friedman

SUBSCRIBED, ACKNOWLEDGED, and SWORN TO before me this 2nd day of _____ 20 19 by David Friedman and Melinda Friedman.

STATE OF ARIZONA } ss.
COUNTY OF PIMA

This foregoing instrument is a full, true, and correct copy of the original on file in this office, that letters were issued on JAN - 7 2019 and said letters are now in full force & effect.

Attested: JAN - 7 2019
GARY L. HARRISON, CLERK
By _____
Deputy Clerk

Notary Public

PHILIP ENGMAN
Notary Public - State of Florida
Commission # GG 258555
My Comm. Expires Sep 13, 2022
Bonded through National Notary Assn.

PLAINTIFFS' EXHIBIT "A"

Leigh H. Bernstein
Rubin & Bernstein PLLC
382 S. Convent Ave.
Tucson, AZ 85701
(520) 623-3038
AZ State Bar No. 016123
Pima County No. 65054

**COPY**

JAN - 7 2019

GARY L. HARRISON
CLERK, SUPERIOR COURT

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF PIMA

| In the Matter of the Guardianship of: | NO. GC20180749 |
|---|---|
| AARON GORDON FRIEDMAN<br><br>An Adult | LETTERS AND ACCEPTANCE OF PERMANENT GUARDIAN OF AN ADULT PROTECTED PERSON |

### ISSUANCE OF LETTERS

David Friedman and Melinda Friedman are appointed as Aaron Friedman's permanent co-guardians. Each co-guardian will have the authority to act independently of the other. Additionally, the co-guardians' power shall be subject to the following restrictions: NONE

Aaron Gordon Friedman retains his right to vote as well as his driving priviliges.

WITNESS: _____

GARY HARRISON
CLERK OF THE SUPERIOR COURT

JAN - 7 2019            By: Karla L. Gonzales
                             Deputy Clerk

State of Florida
County of Palm Beach     ss.    **ACCEPTANCE**

We hereby accept the duties of co-guardians for Aaron Friedman and swear that we will perform such duties according to law.

_____          _____
David Friedman                    Melinda Friedman

SUBSCRIBED, ACKNOWLEDGED, and SWORN TO before me this 2nd day of January 20 19 by David Friedman and Melinda Friedman.

_____
Notary Public

PHILIP ENGMAN
Notary Public - State of Florida
Commission # GG 258555
My Comm. Expires Sep 13, 2022
Bonded through National Notary Assn.

1  Leigh H. Bernstein
   RUBIN &BERNSTEIN PLLC
2  382 S. Convent Ave.
   Tucson, AZ 85701
3  (520) 623-3038
   AZ Bar No. 016123 & 034024
4  Pima Computer No. 65054 & 67087



COPY

JAN -7 2019

GARY L. HARRISON
CLERK, SUPERIOR COURT

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
IN AND FOR THE COUNTY OF PIMA

| In the Matter of the Guardianship of: | NO. GC20180749 |
|---|---|
| **AARON GORDON FRIEDMAN** | **ORDER TO GUARDIAN** and ACKNOWLEDGMENT, Information to Interested Persons |
| *An Adult* | |

The welfare and best interest of the person named above ("your ward") are matters of great concern to this Court. By accepting appointment as guardian you have subjected yourself to Court's power and supervision. You are required to be guided by this Order and comply with its provisions, as it relates to your duties as guardian as follows:

1. You have powers and responsibilities similar to those of a parent of a minor child, though you are not legally obligated to support your ward with your own funds.

2. Unless the order appointing you provides otherwise, your duties and responsibilities include (but are not limited to) making appropriate arrangements to see that your ward's personal needs (such as food, clothing, and shelter) are met. Your obligation to the ward is akin to the responsibility a parent has to a minor child.

3. You are responsible for making decisions concerning your ward's educational, social, and religious activities. If your ward is 14 years of age or older, you must take into account the ward's preferences to the extent they are known to you or can be discovered with a reasonable amount of effort.

4. You are responsible for making decisions concerning your ward's medical needs. Such decisions include (but are not limited to) the decision to place your ward in a nursing home or other health care facility and the employment of doctors and nurses to provide for your ward's health care needs. However, you must use the least restrictive means and environment available that meet your ward's needs.

5. You may arrange for medical care to be provided even if your ward does not wish to have it.

6. You may handle small amounts of money or property belonging to your ward without being appointed as a conservator. "Small amount" means that the ward

does not receive income exceeding $10,000.00 per year, does not accumulate funds exceeding that amount, and owns no real property. If more than these amounts come into your possession, you are required to petition the Court for the appointment of a conservator.

7. If you handle any money or property belonging to your ward, you have a duty to do each of the following:

    a. Care for and protect your ward's personal effects;

    b. Apply any monies you receive for your ward's current support, care, and education needs;

    c. Conserve any excess funds not so spent for your ward's future needs;

    d. Maintain your ward's funds in a separate account, distinct from your own and identified as belonging to the ward;

    e. Maintain records of all of the ward's property received and expended during the period of the guardianship;

    f. Account to your ward or your ward's successors at the termination of the guardianship, if requested; and. Not purchase, lease, borrow, or use your ward's property or money for your benefit or anyone else's, without prior Court approval.

8. You shall not accept any remuneration of any kind for placing your ward in a particular nursing home or other care facility, using a certain doctor, or using a certain lawyer. "Remuneration" includes, but is not limited to, direct or indirect payments of money, "kickbacks," gifts, favors, and other kinds of personal benefits.

9. You will need to obtain a certified copy of the letters that are issued to you by the clerk of the superior court. Your certified copy is proof of your authority to act as guardian of your ward, and you should have this document available when acting on behalf of your ward. You may need to obtain additional (or updated) copies from time to time for delivery to, or inspection by, the people with whom you are dealing.

10. You are required to report annually, in writing, with respect to your ward's residence, physical and mental health, whether there still is a need for a guardian, and your ward's financial situation. Your report is due each year on the anniversary date of your appointment.

11. If your ward's physical address changes, you shall notify the court by updating the probate information form within three days of learning of the change in your ward's physical address. If your ward dies, you shall notify the court in writing of the ward's death within ten days of learning that the ward has died.

12. You must be conscious at all times of the needs and best interests of your ward. If the circumstances that made a guardianship necessary should end, you are responsible for petitioning the Court to terminate the guardianship Even if the guardianship should terminate by operation of law, you will not be discharged from your responsibilities until you have obtained an order from this Court discharging you.

13. If you become unable to continue with your duties for any reason, you (or your guardian or conservator, if any) must petition the Court to accept your resignation and appoint a successor. If you should die, your personal representative or someone acting on your behalf must advise the Court and petition for the appointment of a successor.

14. If you have any questions about the meaning of this order or the duties that it and the statutes impose upon you by reason of your appointment as guardian, you should consult an attorney or petition the Court for instructions.

15. If you are not a licensed fiduciary and are not related by blood or marriage to the ward, you are not entitled to compensation for your services as the ward's guardian. See A.R.S. § 14-5651(J)(1).

16. WITHIN THIRTY (30) DAYS AFTER YOUR LETTERS OF GUARDIAN ARE ISSUED, YOU MUST MAIL A COPY OF THIS ORDER TO GUARDIAN AND ACKNOWLEDGMENT AND INFORMATION TO INTERESTED PERSONS TO THE FOLLOWING:

A. YOUR WARD;

B. ANY PERSON WHO HAS FILED A DEMAND FOR NOTICE IN CONNECTION WITH THIS MATTER.

This is only an outline of some of your duties as guardian. It is your responsibility to obtain proper legal advice about your duties. Failure to do so may result in personal financial liability for any losses.

**WARNING: THIS APPOINTMENT IS NOT EFFECTIVE UNTIL THE LETTERS OF APPOINTMENT HAVE BEEN ISSUED BY THE CLERK OF THE SUPERIOR COURT.**

**FAILURE TO OBEY THE ORDERS OF THIS COURT AND THE STATUTORY PROVISIONS RELATING TO GUARDIANS MAY RESULT IN YOUR REMOVAL & OTHER PENALTIES. IN SOME CIRCUMSTANCES, YOU MAY BE HELD IN CONTEMPT OF COURT, AND YOUR CONTEMPT MAY BE PUNISHED BY CONFINEMENT IN JAIL, A FINE, OR BOTH. THIS ORDER SHALL BE EFFECTIVE IMMEDIATELY.**

DATED this _7_ day of January, 2019.

*Julia K. Connors*

The Hon. Julia Connors, Commissioner of the Arizona Superior Court, Pima County

///
///
///